IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION


BRIAN WHITLEY, Individually and
on Behalf of All Others Similarly Situated                PLAINTIFF


v.                          No. 4:16-cv-624-DPM


BAPTIST HEALTH; BAPTIST HEALTH
HOSPITALS; DIAMOND RISK
INSURANCE LLC; CONTINENTAL
CASUALTY COMPANY; ADMIRAL
INSURANCE COMPANY; ADMIRAL
INDEMNITY COMPANY; IRONSHORE
INDEMNITY, INC.; and IRONSHORE
SPECIALTY INSURANCE COMPANY                DEFENDANTS


MEMORANDUM OPINION AND ORDER

1. The parties have done their discovery on Whitley's claims and class-related issues. Whitley now seeks certification of a class, while Baptist seeks to end the case on summary judgment. Here are the material facts, taken in the light most favorable to Whitley where genuinely disputed. *Woods v. DaimlerChrysler Corporation*, 409 F.3d 984, 990 (8th Cir. 2005).

**2.** In November 2013, Whitley, a Little Rock firefighter, was badly injured in a car wreck.  He was treated at Baptist.  On admission, he signed a form, which included an assignment of insurance benefits. *№ 120-13 at 2.*  The provision is in the margin.*  The parties' arguments center on the provision's opening sentences:   an across-the-board assignment of all rights in applicable liability insurance;  and a term about who Baptist could seek payment from first.  More on all this in a moment.  Baptist provided Whitley approximately $18,000 in medical care. *№ 58-1 at 16.*

Whitley had insurance from his employer through QualChoice. Baptist did not send QualChoice a bill immediately for Whitley's original care.  He had been hit by a driver going the wrong way on Interstate 440.  The liability of a third party was thus gin clear.  In those

---

* **ASSIGNMENT OF INSURANCE BENEFITS**:  I hereby assign any and all rights and benefits to which I may be entitled arising out of any healthcare or liability insurance policy, Medicare or Medicaid to Baptist Health.  I authorize the full and undiscounted pursuit of payment on my account from any available liability insurance policy or third party source before submission of my account for payment to my own health insurance company or to Medicare or Medicaid.  I hold Baptist Health harmless of any reduction in healthcare benefits by my insurance company resulting from noncompliance with any clause or condition contained in my policy which may require:   Notification; Precertification;  Prior to Retrospective Authorization; or Utilization Review of the medical services I receive.  Assignment of Insurance benefits is valid and binding until final payment of the account is received.

circumstances, Baptist's policy was to code the primary insurance for the charges as "RevClaims," and the patient's insurance as secondary insurance. That was done. RevClaims collects on bills for Baptist. It filed an approximately $18,000 lien the month after Baptist's initial care of Whitley. № 130-4 at 6. The hospital's policy in these likely third party liability situations such as Whitley's had another layer. If the lien was not resolved within a few months, Baptist would also file a claim with the patient's health insurance. That window was usually six months. Someone made a mistake on Whitley's first round of charges; the claim was sent to QualChoice after the claim period expired; and QualChoice rejected it, declining to pay any benefits for those charges, which would have been covered but for a small co-pay, based on Baptist's tardy submission. № 120-3 at 33 & 36.

Whitley needed more medical care. In January 2014, some two months after the accident, he returned to Baptist, signed an identical admissions agreement, and incurred approximately $46,000 of charges. № 58-1 at 17–18. Baptist increased its lien to approximately $64,000. № 130-4 at 7.

A few months later, in May 2014, Progressive—who insured the driver who had run into Whitley—offered Whitley's lawyer a policy-limits settlement of $50,000. № 58-1 at 10–14. The lien stood between Whitley and the money. ARK. CODE ANN. § 18-46-112. At that point,

Baptist's $64,000 lien exceeded the offer, so all the money would have flowed to the hospital. Settlement talks stalled.

Baptist met its 180-day deadline to submit a claim to QualChoice for the second round of Whitley's care. QualChoice paid that claim in the fall of 2014—Baptist received approximately $7,000. Based on the reduced rates created by the Baptist/QualChoice provider agreement, the hospital took an approximately $38,000 hit on the bill. *№ 120-3 at 34–35.*

Even though QualChoice paid the agreed amount for Baptist's care of Whitley, the hospital did not reduce its lien. At the end of 2014, the hospital renewed its lien for the full amount, approximately $64,000. *№ 130-4 at 8.* Baptist did the same thing in May of 2015. *№ 130-4 at 9.* At the end of 2015, approximately two years after Whitley's first round of care, Baptist reduced the lien to approximately $19,000—the full initial bill, plus a co-pay for the second round of care. *№ 130-4 at 10.* In mid-2016, Baptist's lien expired by operation of law. ARK. CODE ANN. § 18-46-106(a). Whitley filed this case a month later. Baptist released the lien in the spring of 2017. *№ 130-4 at 11–15.*

At some point thereafter, Whitley accepted Progressive's $50,000 settlement offer. The money was divided between Whitley and his lawyers, but Whitley has refused to give Baptist any specifics on the division. *№ 116-2 at 20–22.*

**3.** The parties' interlaced arguments on both motions require the Court to rule on some issues of Arkansas law. All these points go to whether Baptist violated the Arkansas Deceptive Trade Practices Act, tortiously interfered with a contract, broke a contract, or was unjustly enriched in its handling of charges in these circumstances.

*First*, the Court rejects Whitley's argument that the assignment provision in Baptist's admission agreement is invalid because tort claims cannot be assigned. The first sentence of this part of the agreement provides — "I hereby assign any and all rights and benefits to which I may be entitled arising out of any healthcare or liability insurance policy, Medicare or Medicaid to Baptist Health." № 120-13 *at 2*. This sweeping provision is aimed at all potential insurance, but can become superfluous where a lien is perfected. Unliquidated tort claims for personal injuries may not be assigned. *Southern Farm Bureau Casualty Insurance Co. v. Wright Oil Co.*, 248 Ark. 803, 809, 454 S.W.2d 69, 72 (1970). Whitley is right about that. But, in *Stuttgart Regional Medical Center v. Cox*, 343 Ark. 209, 33 S.W.3d 142 (2000), the Court assumed that this kind of admission-agreement assignment was valid. Put that precedent to one side. The dispositive point is that the Medical, Nursing, Hospital, and Ambulance Service Lien Act, ARK. CODE ANN. §§ 18-46-101 *et seq.*, creates a right in the complying healthcare provider to collect for its services through a lien on "any claim, right of action, and money to which the patient is entitled because of that injury. . .."

- 5 -

ARK. CODE ANN. § 18-46-104(2). In circumstances like Whitley's, the statute does all the material legal work, not any assignment.

*Second*, the Court is not persuaded by Whitley's generalized attack on the Medical Lien statute. The Arkansas Supreme Court rejected a similar effort in *Stuttgart Regional*. Whitley is right that the statute's purpose was to ensure treatment of indigents injured by others, giving those who provided medical care some security in any future tort recovery. *Buchanan v. Beirne Lumber Co.*, 197 Ark. 635, 124 S.W.2d 813, 815 (1939). The statute's plain words, though, reach further than this prompting purpose, which is not unusual. This Court predicts that, when squarely faced with the issue, the Arkansas Supreme Court would not limit the Medical Lien statute to treatment of patients who have no health insurance. *Blankenship v. USA Truck, Inc.*, 601 F.3d 852, 856 (8th Cir. 2010). The Supreme Court would instead follow *Stuttgart Regional*: In general, a medical provider can give notice and stand on its lien, even if there is some applicable coverage floating around.

*Third*, in the admission agreement, Whitley also authorized "the full and undiscounted pursuit of payment on my account from any available liability insurance party or third-party source before submission of my account for payment to my own health insurance company or to Medicare or Medicaid." № 120-13 *at 2*. The fighting word is "before." Whitley was injured in the wreck, prompting some suggestion that he didn't understand this authorization. His capacity

- 6 -

was not impaired in any way, though, when he signed the same agreement before his second round of treatment. Absent circumstances not present here, Arkansas law holds Whitley to his agreement, even if he didn't read it, or have a lawyer's understanding of it, before he signed. *Carmichael v. Nationwide Life Insurance Co.*, 305 Ark. 549, 552, 810 S.W.2d 39, 41 (1991).

Whitley resists this pre-submission authorization, saying that the Baptist/QualChoice provider agreement did not allow patients to make a different deal about payments with healthcare providers. Whitley argues from § 4.9(d) of the provider agreement. This is the last part of a four-part provision about billing covered patients. *№ 84 at QC000355–56* (under seal). The entire provision is in the margin.[**]

---

[**] 4.9 **Member Billing; Exceptions**.

4.9(a) Facility shall refrain, and shall cause Network Providers employed or subcontracted by it to refrain, in every instance from charging, billing, balance billing, or demanding any payment from any Member for services which are determined would be Covered Medical Services, but for which payment is disallowed, in whole or in part, because of the failure of Facility to meet or comply with any of the applicable requirements of this Agreement, including without limitation applicable patient care reimbursement authorization requirements, utilization review program requirements, and policies, rules or regulations adopted or amended by QualChoice pursuant to this Agreement.

4.9(b) Facility shall refrain, and shall cause Network Providers employed or subcontracted by it to refrain, in every instance, from charging, demanding a deposit from, or otherwise seeking to be

Whitley overreads the last part. Baptist and QualChoice agreed to specific terms that protected Whitley and other "members" against direct requests to pay the bills, subject to inapplicable exceptions for co-payments and a few other things. Section 4.9(d) prevented Baptist and Whitley from agreeing otherwise at some later point; section 4.9(d) did not bar Whitley from agreeing to Baptist's request for authorization to go after a third party, the man who hit him, before submitting a claim to QualChoice.

---

compensated by a Member for Covered Medical Services or any other services, except for charges (i) for services which the Plan Administrator determines are not Covered Medical Services, (ii) for any applicable Copayment, Deductible or Coinsurance amounts, or (iii) for services chargeable to a Member as provided in Section 4.10 hereof.

4.9(c) Except as may otherwise be permitted by Sections 2.3, 4.9(b) and 4.10 hereof, Facility shall, in every instance, including but not limited to nonpayment or insolvency by a Payor, or Plan Administrator, or breach of this Agreement, refrain, and shall cause Network Providers employed or subcontracted by it to refrain, from billing, charging, collecting a deposit from, seeking compensation, remuneration or reimbursement from, or having any recourse against any Member, Payor, or persons other than the Plan Administrator, except as provided for in Section 2.3 herein.

4.9(d) With respect to services performed during the term of this Agreement, Section 4.9 shall survive the termination of this Agreement regardless of the cause giving rise to termination and this provision supersedes any oral or written contrary agreement now existing or hereafter entered into between Facility and any Member or persons acting on a Member's behalf with respect to Covered Medical Services.

*Fourth,* § 4.9's adamantine insulation of Whitley (and others) with their own insurance against most direct claims by Baptist (and other healthcare providers) is a significant benefit flowing from the Baptist/QualChoice agreement. Baptist argues hard that Whitley has no breach claim based on the provider agreement because he was neither a party to it nor a third-party beneficiary of it. Whitley was not a party. And, as Baptist says, Arkansas law presumes that parties make contracts only for their mutual benefit. *Perry v. Baptist Health,* 358 Ark. 238, 244, 189 S.W.3d 54, 58 (2004). Baptist also points to a provision of the provider agreement, which it says makes plain that its business relationship with QualChoice was solely about their mutual business, not benefitting folks situated like Whitley. Section 7.6 is entitled "**Independence of the Parties**." It says, "QualChoice is independent of Facility. Nothing in the Agreement shall be deemed to create a relationship of employer and employee or principal and agent or any relationship other than that of independent parties contracting with each other solely for the purpose of carrying out the provisions of the Agreement. Facility is not authorized to represent QualChoice for any purpose. QualChoice is not authorized to represent Facility for any purpose."

The Court disagrees with Baptist about whether Whitley has a solid contract claim as a third-party beneficiary of the provider agreement. Of course this agreement was about the contracting parties'

- 9 -

business. But that business was taking care of patients and paying for their care. That was an animating purpose of the agreement's provisions. The evidence shows a clear intent to benefit patients situated like Whitley: Baptist agreed to accept reduced rates for services in return for prompt payments from QualChoice, who also provided a host of potential patients. Either on the facts taken in the light most favorable to Whitley, or as a matter of law should the provider agreement need construction on undisputed facts, the conclusion that Whitley was a third-party beneficiary of the Baptist/QualChoice contractual relationship is easily and reasonably reached. *Perry*, 358 Ark. at 244, 189 S.W.3d at 58.

*Fifth*, does the record entitle Baptist to judgment as a matter of law now on some or all of Whitley's claims? As noted, the Court is not persuaded by Whitley's broad contention that the Baptist/QualChoice provider agreement, which incorporated the provider manual, № 130-3, forbade Baptist to go the lien route. The documents contained no unequivocal bar. Another provider agreement in the record does. Compare Aetna's agreement, which states "Hospital hereby agrees that in no event . . . shall Hospital bill, charge, collect a deposit from, seek remuneration or reimbursement from, or have any recourse [against] . . . any settlement fund or other *res* controlled by or on behalf of, or for the benefit of, a Member for Covered Services." № 120-22 *at* § 4.3.2 (under seal). The general and venerable rule is that parties contract

- 10 -

against the background of existing law. *Petty v. Missouri & Arkansas Railway Co.*, 205 Ark. 990, 167 S.W.2d 895, 898 (1943). The Medical Lien statute dates from the 1930s, and the Arkansas Supreme Court spoke approvingly about that law in the *Stuttgart Regional* case, which was decided two decades ago.

The provider manual reserves the right to QualChoice to recover benefits paid from a third party who caused injury, but does not say Baptist cannot do so. № 130-3 *at 28*. See the full subrogation term in the margin.*** Here, Baptist deploys the parties' course of dealing. As recounted in the depositions, QualChoice has left the pursuit of

---

*** **Subrogation**

To the extent permitted under applicable state and federal law and the applicable benefit plan, QualChoice reserves the right to recover benefits paid for a member's health care service when a third party causes the member's injury or illness.

If a QualChoice member who has been involved in a motor vehicle accident or workers' compensation injury visits your office, you should:

1.    Record the name of the member's automobile insurance company and/or their workers' compensation carrier

2.    Verify the member's eligibility through QualChoice

3.    Submit any claims to QualChoice

Following these steps will help us expedite processing and help ensure that the claim [is] paid accurately. Once the claims are submitted, QualChoice works with Trover Solutions, a third-party subrogation vendor, to determine if the member's automobile insurer or the workers' compensation carrier is responsible for paying the claims (this process varies depending on the provider's agreement or the member's benefit plan).

tortfeasors in the hospital's hands, or rather, in the hospital's bill-collector's hands. № 120-2 *at 233–36*; № 120-3 *at 31–32* (deposition pagination). The parties' course of dealing can modify their contractual intentions. *Trucker's Exchange, Inc. v. Border City Foods, Inc.*, 67 Ark. App. 231, 235–36, 998 S.W.2d 434, 437 (1999); RESTATEMENT (SECOND) OF CONTRACTS §§ 202, 223. The way the parties did their business weighs against Whitley's claims, but the record is too divided for the Court to rule for Baptist as a matter of law.

Whitley responds with several provisions of the provider agreement that support his claim of wrongdoing.

- § 2.1(a) – The Facility will be compensated for Covered Medical Services provided to members in accordance with the provisions of Exhibit A annexed hereto and incorporated herein. Facility shall accept such amounts paid, in addition to any applicable Member Copayments, Deductible, and/or Coinsurance, as payment in full for such Covered Medical Services.

- § 4.8(a) – Facility shall bill QualChoice or applicable Payor for its services and the services of Network Providers employed or subcontracted by it.

- § 4.9(c) – Except as may otherwise be permitted by Sections 2.3, 4.9(b) and 4.10 hereof, Facility shall, in every instance, including but not limited to nonpayment or insolvency by a Payor, or Plan Administrator, or breach of this Agreement, refrain, and shall cause Network Providers employed or subcontracted by it to refrain, from billing, charging, collecting a deposit from, seeking

compensation, remuneration or reimbursement from, or having any recourse against any Member, Payor, or persons other than the Plan Administrator, except as provided for in Section 2.3 herein.

- § 4.18 – Facility shall submit to the Plan Administrator or Payor within one hundred and eighty (180) days of provision of Covered Medical Services, accurate and complete claims ("clean claims"). . ..

Whitley reads the "shall" in these provisions as "must," and the word often carries that meaning—a mandate. *Marcum v. Wengert*, 344 Ark. 153, 165, 40 S.W.3d 230, 238 (2001). But, shall can also carry a softer meaning, something closer to may. *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 432–33 n.9 (1995). One of the main changes in the recent restyling of the Federal Rules, for example, was to replace shall with must when the rule was mandatory, eliminating the latent ambiguity. *E.g.*, FED. R. CIV. P. 1, Advisory Committee Notes to 2007 Amendment.

Whitley argues hard from § 4.9(c) in particular. Boiled down, this term of the provider agreement says that (with inapplicable exceptions) Baptist "shall, in every instance . . . refrain . . . from . . . seeking compensation, remuneration or reimbursement from, or having any recourse against any Member, Payor, or persons other than the Plan Administrator . . .." № 84 at QC000356 (under seal). Whitley says the other driver and its insurer qualify as either payors or persons. The

payor road doesn't go far. Under § 1.25 of the provider agreement, "'**Payor**' means the party that is financially responsible for paying for Covered Medical Services provided in accordance with this Agreement and the applicable Health Plan. A Payor may be a self-funded employer ("Employer Group"), insurance company, health maintenance organization ("HMO"), or other party." № 84 at QC000351. This provision is aimed at entities such as QualChoice, though it might be stretched to cover tortfeasors or their insurers. But that reading runs into the Medical Lien statute, the background law, plus the Baptist-QualChoice course of dealing. Through that statute, Baptist was seeking recourse — but only against the tortfeasor's coverage, which generated the settlement pot, rather than against some "person." The hospital filed a lien not a lawsuit. Whitley has an argument here, though not as strong as the one an Aetna insured would have. Aetna's provider agreement barred Baptist from any recourse against any settlement fund or res that benefitted the insured. № 120-22 at § 4.3.2 (under seal). Not so, here.

A word about Arkansas Insurance Department Rule 21. That rule guides plans on how to coordinate benefits and pay and process claims. № 116-1 at 6. The Court is not persuaded by Baptist's arguments that, in these circumstances, it is simply coordinating benefits. The other driver's coverage was not a "Plan" within the meaning of Rule 21, which excludes "accident only coverage." № 116-1 at 9–10.

- 14 -

All this makes a murky stew rather than a clear broth. And all the terms of Baptist's provider agreements with Health Advantage, Blue Cross Blue Shield, Humana, Aetna, and UnitedHealthcare are not even in the pot yet.

Whitley's strongest claim (whatever the doctrinal label) is that Baptist persisted in its approximately $64,000 lien for more than a year after getting paid by QualChoice for the second round of treatment. Whatever the provider agreement and manual may have required on the front end, and however the parties' course of dealing may have modified their contractual relationship, Whitley has a robust claim that Baptist erred by persisting with the full lien after accepting QualChoice's payment for the second round of treatment, which generated roughly two-thirds of the bill. "Facility shall accept such amounts paid, in addition to any applicable Member Copayments, Deductible, and/or Coinsurance, *as payment in full* for such Covered Medical Services." *№ 84 at QC000351, § 2.1(a)* (under seal with emphasis added). That term is clear, even if it does contain a dreaded and/or.

Each of the five other provider agreements contained an equally strong and equally clear commitment by Baptist. The hospital agreed with Aetna that "payment [by the Plan] will be considered full and final payment" for the claims. *№ 120-22 at § 4.1.1* (under seal). It agreed with Humana that "Payments made . . . [less copayments] shall be

accepted by [Baptist] as payment in full from Payors for all Covered Services." *№ 120-21 at § 13.1* (under seal). With both Health Advantage and Blue Cross Blue Shield, Baptist agreed that it would "accept [the Plan payment] as payment in full for covered services." *№ 120-19 at § II.B* (under seal); *№ 120-20 at § II.B* (under seal). And Baptist agreed with UnitedHealthcare that the "[Plan payment], together with any co-payment, deductible or coinsurance for which the Customer is responsible . . . is payment in full for a Covered Service." *№ 120-23 at § 6.7* (under seal). A jury could find that, as with Whitley, the folks with coverage through these other companies should not have faced liens after Baptist accepted an agreed, albeit lower, payment for the services.

And, as best the Court can tell at this point, none of the provider agreements contains any provision that would, as a matter of law, clearly undermine a claim by covered individuals for Baptist's conduct. Some of the agreements do clearly renounce an intent to create third-party beneficiary rights in a covered patient. The Health Advantage agreement, for example, states that "there is no intent by either party to create or establish third party beneficiary status or rights as to any patient[.]" *№ 120-19 at § X* (under seal). And Humana and Baptist agreed "the parties . . . do not intend to create by this Agreement any rights in other parties as third party beneficiaries of this Agreement, including, without limitation, Members." *№ 120-21 at § 3.1* (under seal). These strong words probably preclude a third-party beneficiary

claim for individuals whose care was covered by those provider agreements. *See Perry,* 358 Ark. at 246, 189 S.W.3d at 59; *Retro Television Network, Inc. v. Luken Communications, LLC,* 696 F.3d 766, 769 (8th Cir. 2012). But, depending on the jury's findings at trial, those individuals could still recover damages for the same conduct by Baptist on one of the other pleaded legal theories.

**4.** Which claims go forward? A jury could conclude that tying up Whitley's settlement funds by maintaining a lien for the full bill after accepting payment for most of it was deceptive under the ADTPA. ARK. CODE ANN. § 4-88-107(a)(10). Whitley also has a solid breach claim as a third-party beneficiary of the Baptist/QualChoice provider agreement. This claim is likewise rooted in Baptist's persisting in the full lien after accepting the negotiated, reduced rate from QualChoice.

Whitley's claim that Baptist tortiously interfered with his health insurance contract with QualChoice could survive, but it is dismissed without prejudice as duplicative. Not every interference is a tort. There must be improper interference. *Stewart Title Guaranty Co. v. American Abstract & Title Co.,* 363 Ark. 530, 549, 215 S.W.3d 596, 607 (2005). Baptist had the right to go the lien route instead of filing a claim with QualChoice. It did not have the right to accept QualChoice's payment without reducing a lien, or eliminating it in situations where Baptist accepted payment for all services rendered. That wrongdoing, however, is well covered by the contract and statutory claims.

- 17 -

The unjust enrichment claim fails. Receiving something of value is an essential element. *El Paso Production Co. v. Blanchard*, 371 Ark. 634, 646, 269 S.W.3d 362, 372 (2007). Baptist's holding up the settlement line harmed Whitley; but it's not clear that Baptist received something of value by doing so. In any event, when the benefit received can't be adequately measured, as here, courts limit or deny restitution. *El Paso Production*, 371 Ark. at 647, 269 S.W.3d at 372; RESTATEMENT (THIRD) OF RESTITUTION & UNJUST ENRICHMENT § 44 (2011). What can be done is to assess the damages Whitley suffered from the delay in receiving his settlement money. His overlapping statutory and contract claims for the same conduct by Baptist ensure he will be made whole for that wrong. *Deutsche Bank National Trust Co. v. Austin*, 2011 Ark. App. 531, *8, 385 S.W.3d 381, 387 (2011).

**5.** This case is appropriate for class resolution. *See* FED. R. CIV. P. 23(a) & (b)(3). Whitley's proposed class, as modified by the Court, meets each of Rule 23(a)'s requirements – numerosity, commonality, typicality, and adequacy of representation. This is a Rule 23(b)(3) group: questions of law common to class members predominate over questions affecting only individuals; and a class is superior to other methods, in terms of fairness and efficiency, for adjudicating the controversy. The Court therefore certifies the following class under Fed. R. Civ. P. 23(b)(3):

- 18 -

All Arkansas residents who, since 30 July 2011, received any type of healthcare treatment from any Arkansas entity owned, controlled, or managed by Baptist Health or Baptist Health Hospitals; (i) the treatment was covered by valid, in network, health coverage that was underwritten, administered, or supported by (a) QualChoice of Arkansas, (b) Health Advantage, (c) Blue Cross Blue Shield, (d) Humana, (e) Aetna, or (f) UnitedHealthcare; (ii) Baptist submitted the charges for the treatment to the patient's health insurer for payment; (iii) Baptist accepted payment from the health insurer for the treatment; (iv) Baptist (itself or through its agents) sought payment for the treatment from sources other than the health insurer by maintaining or asserting hospital lien(s) for the treatment after accepting payment from the health insurer; and (v) the individual sustained damages.

This class is sufficiently numerous that joinder of all members is impracticable. FED. R. CIV. P. 23(a)(1). Baptist, through RevClaims, has asserted liens for the accounts of more than six thousand patients covered by the six major health insurance carriers. *№ 121 at 13*; *№ 120-15 & № 120-16* (under seal); *№ 120-6 at 40* (deposition pagination). It's unclear exactly how many of these patients Baptist treated like Whitley. But evidence of the exact class size isn't necessary

so long as the circumstances allow for a reasonable estimate. *Riedel v. XTO Energy, Inc.*, 257 F.R.D. 494, 506–07 (E.D. Ark. 2009); 1 NEWBERG ON CLASS ACTIONS, § 3:13 (5th ed.). Considering the thousands of Baptist liens, and that Baptist maintained its lien against Whitley for more than a year after accepting payment from QualChoice, it is likely that Baptist held on to other liens for too long. The Court infers that the class is big enough to make joinder of all the affected former patients impracticable. *Compare Arnold Chapman & Paldo Sign & Display Co. v. Wagener Equities, Inc.*, 747 F.3d 489, 492 (7th Cir. 2014). Some targeted discovery in the next few months will generate a firmer number on class size.

Commonality exists. The remaining question in the case is whether Baptist could assert or persist in liens after accepting payment from the patient's health insurance plan. The answer to this common question will substantially resolve the case in one stroke. FED. R. CIV. P. 23(a)(2); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349–50 (2011). If Baptist couldn't act as it did, then each patient who suffered damages from Baptist's assertion or persistence in a lien after accepting payment from the patient's health insurance plan suffered the same injury. *Wal-Mart Stores*, 564 U.S. at 350. And the common question predominates over any questions affecting only specific individuals, such as the amount of damage. *See* FED. R. CIV. P. 23(a)(2) & (b)(3).

Whitley's claim is typical of the group. FED. R. CIV. P. 23(a)(3); *DeBoer v. Mellon Mortgage Co.*, 64 F.3d 1171, 1174–75 (8th Cir. 1995). He shares the same interest with the rest of the class members. He will fairly and adequately protect class members' interests through his capable and experienced lawyers. FED. R. CIV. P. 23(a)(4). And the Court appoints those lawyers as class counsel with one caution. FED. R. CIV. P. 23(c)(B). Whitley has eight lawyers of record. They must divide and conquer, rather than duplicating effort.

Finally, a class action is the best way to fairly and efficiently manage this case to resolution. *See* FED. R. CIV. P. 23(b)(3). Individual actions would be cost prohibitive because of the relatively small individual recovery and the expense of litigation; the Court knows of no other similar pending cases against Baptist; this district is a practical forum for the parties, particularly Baptist; and the limited nature of the remaining claims demonstrates manageability.

\* \* \*

Baptist's motion for summary judgment, № *116*, is partly granted and partly denied. Whitley's motion for class certification, № *120*, is partly granted as modified and partly denied. The Court directs the parties to do some targeted discovery to provide the Court a firmer number on class size. The Court also directs the parties to confer and make a proposal about the form, substance, and method of notice. Joint

report on class size and notice issues due by 15 November 2019. A Second Amended Final Scheduling Order will issue.

So Ordered.

*D.P. Marshall Jr.*
D.P. Marshall Jr.
United States District Judge

*13 September 2019*